**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | Bankruptcy No. 17-70825-JAD |
| | : | |
| ADVANCED VASCULAR RESOURCES | : | Chapter 11 |
| OF JOHNSTOWN, LLC, | : | |
| | : | Doc. No.: _____ |
| Debtor. | : | |
| | : | Related To Doc. No.: 1 |
| SAMIR HADEED, MD and JOHNSTOWN | : | |
| HEART AND VASCULAR CENTER, INC. | : | Hearing Date: February 22, 2018 |
| | : | |
| Movants, | : | Hearing Time: 10:00 a.m. |
| | : | |
| v. | : | |
| | : | |
| ADVANCED VASCULAR RESOURCES | : | |
| OF JOHNSTOWN, LLC, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**<u>EXHIBIT "1"</u>**

## ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC
## OPERATING AGREEMENT

THIS OPERATING AGREEMENT (as amended from time to time, the "**Agreement**") is made and entered into on November 7, 2013 (the "**Effective Date**"), by and among ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC, a Delaware limited liability company (the "**Company**"), and each of the Persons designated as Members on Schedule I attached hereto (such Persons and their respective successors in interest being hereinafter referred to individually as a "**Member**" and collectively as the "**Members**").

### Recitals

WHEREAS, the Certificate of Formation of the Company (the "**Certificate**") was filed with the Secretary of State of the State of Delaware on July 24, 2013, to organize the Company as a Delaware limited liability company; and

WHEREAS, the Members desire to operate the Company in accordance with the terms of, and subject to the conditions set forth in, this Agreement and to set forth certain rights, duties, obligations, liabilities and powers of the Company, the Members and the Manager of the Company;

### Agreement

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members, intending to be legally bound, hereby agree as follows:

### ARTICLE I
### Defined Terms

Capitalized terms not otherwise defined herein shall have the meanings specified in this ARTICLE I.

"**Act**" shall mean the Delaware Limited Liability Company Act, Title 6, §§18-101, et. seq., as amended from time to time.

"**Adjusted Capital Account Deficit**" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of any relevant Allocation Year, after giving effect to the following adjustments:

(A)     the deficit shall be decreased by the amounts that such Member is deemed obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g) and 1.704-2(i)(5); and

(B)     the deficit shall be increased by the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Affiliate**" shall mean, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, member, partner or shareholder of such Person or (iii) any Person who is an officer, director, member, partner or shareholder of any Person described in clauses (i) or (ii) of this sentence. For purposes of this definition,

63017444

AVR00020

the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or indirect, of ten percent (10%) or more of any class of voting securities of the specified Person.

"**Allocation Year**" shall mean (i) the period commencing on the date of this Agreement and ending on December 31, 2013, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31 or (iii) any portion of the period described in clauses (i) or (ii) for which the Company is required to allocate Profits, Losses and any other items of Company income, gain, loss or deduction pursuant to ARTICLE VI.

"**Bankruptcy**" shall mean, with respect to any Person:  (a) the filing of an application by such Person for, or such Person's consent to, the appointment of a trustee, receiver or custodian of its assets; (b) the entry of an order for relief with respect to such Person in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by such Person of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of such Person unless the proceedings and the trustee, receiver or custodian appointed are dismissed within one hundred twenty (120) days; or (e) the failure by such Person generally to pay such Person's debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of such Person's inability to pay its debts as they become due.

"**Built-In Gain**" shall have the definition set forth in Section 5.6.4.

"**Capital Account**" shall mean the account to be maintained by the Company for each Member in accordance with the provisions of Section 1.704-1(b)(2)(iv) of the Treasury Regulations, including the following provisions:

(A)      to each Member's Capital Account there shall be credited such Member's Capital Contribution, the amount of any Company liabilities assumed by such Member or which are secured by property distributed to such Member, and such Member's distributive share of Profit and any item in the nature of income or gain specially allocated to such Member pursuant to the provisions of Section 6.3 (other than Section 6.3.3); and

(B)      to each Member's Capital Account there shall be debited the amount of money and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company and such Member's distributive share of Loss and any item in the nature of expenses or losses specially allocated to such Member pursuant to the provisions of Section 6.3 (other than Section 6.3.3).

In addition, consistent with and as permitted in the provisions of Treasury Regulations §1.704-1(b)(2)(iv)(f), the Capital Accounts of all Members and the Gross Asset Values of all Company properties may (as determined by the Manager) be adjusted upwards or downwards to reflect any unrealized gain or unrealized loss with respect to such Company property (as if such unrealized gain or unrealized loss had been recognized upon an actual sale of such property for the amount of its fair market value immediately prior to the event giving rise to the revaluation, and had been allocated among the Members pursuant to ARTICLE VI).  In determining such unrealized gain or unrealized loss, the fair market value of Company properties as of the date of determination shall be determined by the Manager.

If any Membership Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to

AVR00021

the transferred Membership Interest. The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations.

"**Capital Contribution**" shall mean, with respect to any Member, the amount of money and initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Member Interest in the Company held or purchased by such Member.

"**Capital Contribution Commitment**" shall mean, with respect to any Member, the amount of Capital Contribution that has been legally committed by such Member but not yet contributed to the Company.

"**Cash Flow**" shall mean for any Allocation Year all gross revenues or receipts for such period, from any source whatsoever of the Company (determined on a cash basis), including distributions from any escrow account, less Permitted Expenses for such period.

"**Cause**" shall mean any breach of an Employee's employment agreement, if any, with the Company or the Company's employment policies, subject to any cure period provided therein, and any definition of the term "cause" or a similar term contained in an Employee's employment agreement, provided, however, that if Employee does not have an employment agreement, or if such agreement does not define "cause" or a similar term, "Cause" shall mean any of the following in subparts (i)-(iii); (i) any act of fraud, material misrepresentation, misappropriation, dishonesty, embezzlement or similar conduct involving in any way the business of the Company; or gross negligence, willful misconduct, breach of trust or breach of fiduciary duty owed to the Company; (ii) failure to perform duties assigned to an Employee provided such duties are consistent in all material respects with the Employee's position, or the Employee's refusal to carry out any direction of the Manager or any officer of the Company to which the Employee reports provided that such direction is consistent in all material respects with the Employee's position; or (iii) abuse of illegal drugs, controlled substances or alcohol; conviction or plea of nolo contendere of or to a felony; or behavior in the work environment that constitutes sexual harassment or discrimination of a protected class.

"**Class**" shall mean Membership Interests established by the Manager in accordance with the authority granted to the Manager pursuant to this Agreement in different series or classes of Membership Interests, with each such Class bearing such rights, obligations, liabilities, privileges, designations and preferences and other terms as the Manager may determine from time to time in his sole discretion upon the issuance of such Class.

"**Class A Interests**" shall mean the Membership Interests held by the Class A Members.

"**Class A Member**" shall mean a Person admitted as a Class A Member and identified as a Class A Member on Schedule I attached hereto and any Person admitted as a Class A Member after the date hereof pursuant to the terms of this Agreement.

"**Class B Interests**" shall mean the Membership Interests held by the Class B Members, which Interests shall not have any voting rights, and which shall be Profits Interests.

"**Class B Member**" shall mean a Person admitted as a Class B Member and identified as a Class B Member on Schedule I attached hereto and any Person admitted as a Class B Member after the date hereof pursuant to the terms of this Agreement.

AVR00022

"**Code**" shall mean Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding revenue law.

"**Confidential Information**" shall mean the definition set forth in <u>Section 3.10</u>.

"**Covered Person**" shall mean the definition set forth in <u>Section 4.7</u>.

"**Depreciation**" shall mean, for each Allocation Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Allocation Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Allocation Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"**Employee**" shall mean an individual who performs substantive services to or for the benefit of the Company, whether as an employee, officer, Manager, consultant or independent contractor of the Company or the Manager.

"**Forfeiture Amount**" shall have the definition set forth in <u>Section 6.3.8</u>.

"**GAAP**" shall mean the United States generally accepted accounting principles, consistently applied.

"**Gross Asset Value**" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

      (A)    The initial Gross Asset Value of any asset contributed by a Class A Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Manager provided that the initial Gross Asset Values of the assets contributed to the Company pursuant to <u>ARTICLE V</u> shall be as set forth on <u>Schedule I</u>;

      (B)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager as of the following times: (i) the acquisition of an additional Member in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1. 704-1(b)(2)(ii)(g), provided that an adjustment described in clauses (i) and (ii) of this paragraph shall be made only if the Manager reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

      (C)    The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Manager; and

      (D)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital

AVR00023

Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and subparagraph (D) of the definition of "Profits" and "Losses" or Section 6.3.4; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (D) to the extent that an adjustment pursuant to subparagraph (B) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (D).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (B) or (D), such Gross Asset Value shall thereafter be adjusted by Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Liquidation Value**" has the definition set forth in Section 5.6.7.

"**Liquidation Value Election**" has the definition set forth in Section 5.6.7.

"**Majority Interest**" shall mean, in connection with any vote, approval or consent of the Class A Members, the affirmative vote, approval or consent of Class A Members that, taken together, hold more than sixty six percent (66%) of the aggregate of all Percentage Interests of Class A Members entitled to act or vote on such matter.

"**Manager**" shall mean the Person who is, from time to time, selected by the Members as the Manager of the Company as provided herein, who shall initially be AVR Management, LLC.

"**Members**" and each, a "**Member**" shall mean each Person who (a) is identified as a Member on Schedule I, has been admitted to the Company as a Member in accordance with this Agreement, or is an assignee who has become a Member in accordance with ARTICLE VII, and (b) has not withdrawn, been removed or if other than an individual, dissolved.

"**Member Nonrecourse Debt**" shall have the meaning ascribed to the term "member nonrecourse debt" in Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" shall have the meaning ascribed to the term "member nonrecourse debt minimum gain" in Regulations Section 1.704-2(i)(2) and determined in accordance with Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" shall mean any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulations Section 1.704-2(i).

"**Membership Interest**" shall mean the entire legal and equitable ownership interest of a Member in the Company at any particular time, including (if and only if the same is provided for hereunder) the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision or action of or by the Members granted pursuant to the terms and provisions of this Agreement or the Act.

"**Minimum Gain**" shall have the meaning ascribed to the term "company minimum gain" in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"**Minority Members**" shall have the definition set forth in Section 7.5.

"**Negative Capital Account**" shall mean a Capital Account with a balance of less than zero.

5

AVR00024

"**Net Profits**" shall mean the gross revenues less all expenses, including without limitation depreciation, amortization, interest and taxes (including taxes representing the income taxes that would be payable if the Company were a taxable entity), of the Company for the period encompassing the four calendar quarters ending immediately preceding the triggering transfer event set forth in ARTICLE VII that gave rise to a calculation of Net Profits under Section 7.9.

"**Nonrecourse Deductions**" shall have the meaning ascribed to it in Regulations Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulations Section 1.704-2(c).

"**Notice**" shall have the definition set forth in Section 10.2.

"**Notice of Sale**" shall have the definition set forth in Section 7.5.

"**Percentage Interest**" shall mean, for any Member, the percentage obtained by dividing the number of Units allocated to such Member by the aggregate number of Units allocated to all Members of the Company. Except as otherwise specifically provided in this Agreement, the Percentage Interests of the Members shall be adjusted upon the admission of a Member, the withdrawal of a Member or any other event that alters the number of Units allocated to any Member or all of the Members in the aggregate as described in Section 3.2.

"**Permitted Expenses**" shall mean all costs (capital, operating and otherwise) of the Company during the Allocation Year, determined on the basis of sound cash basis accounting practices applied on a consistent basis (including reasonable reserves as determined by the Manager, but excluding depreciation, amortization and any other non-cash deductions of the Company for income tax purposes).

"**Person**" shall mean an individual, a company, a corporation, a limited liability company, a business trust, a joint stock company, a trust, an unincorporated association, a joint venture or any other entity of whatever nature.

"**Positive Capital Account**" shall mean a Capital Account with a balance greater than zero.

"**Prime Rate**" shall mean a varying rate per annum that is equal to the interest rate published by *The Wall Street Journal* from time to time as the prime commercial or similar reference interest rate, with adjustments in that varying rate to be made on the same date as any change in that rate.

"**Profit**" and "**Loss**" shall mean, for each Allocation Year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

    (A)    all items of income, gain, loss, deduction or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

    (B)    any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

    (C)    any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

AVR00025

(D)    in the event that the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (B) or (C) above within the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss;

(E)    gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding the fact that the Gross Asset Value differs from the adjusted basis of the property for federal income tax purposes;

(F)    in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the Depreciation for such Allocation Year, computed in accordance with the definition of Depreciation;

(G)    to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Account as a result of a distribution other than in complete liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profit or Loss; and

(H)    notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Sections 6.3.1, 6.3.2, 6.3.4, 6.3.5 and 6.3.8 shall not be taken into account in computing Profit or Loss.

"**Profits Interests**" shall mean the Class B Interests that may be granted to Employees pursuant to and subject to the terms and conditions set forth in Section 5.6, which Class B Interests may be either Restricted Interests or Unrestricted Interests.

"**Regulations**" shall mean the income tax regulations, including any temporary regulations, as in effect on the date of this Agreement.

"**Restricted Interests**" shall mean Profits Interests which are subject to vesting or forfeiture provisions as determined by the Manager.

"**Settlement Date**" shall have the definition set forth in Section 7.10.1.

"**Transfer**" shall mean the sale, gift, assignment, pledge, grant of a security interest or other transfer, whether voluntarily or involuntarily (including by operation of law, on account of any Bankruptcy or other proceeding, or judicial sale or otherwise), by a Member or its Affiliate of all or any part of its direct or indirect (A) Membership Interest, or (B) any other interest or rights in or granted by this Agreement, or the act of making such Transfer, as the context may require.

"**Units**" shall mean the units assigned to a Member under the terms of this Agreement as set forth on Schedule I as amended from time to time for purposes of determining such Member's Percentage Interest in the Company and/or as set forth in a subscription agreement accepted and approved by the Manager in the case of the sale of Units of Class A Interests or in a Profits Interest award agreement in the case of an award of Units of Class B Interests awarded to Employees.

AVR00026

"**Unrestricted Interests**" shall mean Profits Interests which are not subject to any vesting or forfeiture provisions, including Restricted Interests which have satisfied all applicable vesting provisions imposed by the Manager.

ARTICLE II
Name; Office; Purpose; Term

2.1     Name of the Company.  The name of the Company is ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC.  The Company may do business under that name and under any other name or names upon which the Manager determines.

2.2     Formation.  The Members have formed the Company under the Act for the purposes and upon the terms and conditions hereinafter set forth.  The rights and liabilities of the Members shall be as provided in the Act, except as otherwise expressly provided herein.  In the event of any inconsistency between any terms and conditions contained in this Agreement and any non-mandatory provisions of the Act, the terms and conditions contained in this Agreement shall govern.  The Company and the Members hereby forever discharge the organizer, and the organizer shall be indemnified by the Company and the Members from and against, any expense or liability incurred by the organizer by reason of having been the organizer of the Company.

2.3     Purpose.  The Company is organized to own and operate a vascular center and to carry on any and all business activities incidental thereto, and to engage in any lawful act or activity which may be carried on by a limited liability company under the Act.  The Company shall have the power and authority to take any and all actions that are necessary, appropriate, advisable, convenient or incidental to or for the furtherance of the purposes set forth in this Section 2.3.  Except as may be otherwise agreed between the Manager and a Member, any Member may engage in and/or possess interests in other business ventures of every nature and description, independently or with others, and neither the Company nor any Member shall have any rights by virtue of this Agreement or the existence of this Company in or to said independent ventures or to the income or profits derived therefrom; provided, however, for so long as a such Member continues to hold any ownership interest in the Company, and for two (2) years thereafter, Member will not obtain or hold any ownership interest, directly or indirectly, in any vascular center that provides any treatment, therapy or service competitive with those offered by the Company, located within thirty (30) miles of the vascular center(s) owned and operated by the Company.  The fact that (i) a Member or (ii) a member of his or her family or (iii) an associate of a Member or of his or her family or (iv) a shareholder, officer or director of a corporate Member or (v) a subsidiary or affiliate of a corporate Member is employed by, or owns, or is otherwise directly or indirectly interested in, or connected with, any person, employed or retained by the Company to render or perform management, general contracting, mortgage placement, financing, brokerage or other services, or from whom the Company may buy merchandise or other property, borrow money, or arrange financing, shall not prohibit the Company from employing such person or from otherwise dealing with him, her or it, and neither the Company nor any of the Members as such shall have any rights in or to any income or profits derived therefrom.

2.4     Term.  The term of the Company shall be perpetual, unless its existence is sooner terminated pursuant to ARTICLE VIII.

2.5     Principal Office.  The principal office of the Company in the State of Delaware shall be located at any location within the State of Delaware upon which the Manager determines.

2.6     Registered Agent.  The registered agent for the service of process and the registered office shall initially be that person and location reflected in the Certificate as filed with the Secretary of State of the

AVR00027

State of Delaware. The Manager may designate another registered agent and/or registered office from time to time in accordance with the Act and any other applicable laws.

2.7    Members. The name, present mailing address and taxpayer identification number of each Member will be kept with the records of the Company maintained in accordance with Section 9.2.

ARTICLE III
MEMBERS; MEMBER INTERESTS

3.1    Members; Membership Interests. Unless named in this Agreement, or unless admitted to the Company as a substituted or new Member as provided herein, no Person shall be considered a Member, and the Company need deal only with the Members so named and so admitted. The Company shall not be required to deal with any other Person by reason of any Transfer or by reason of the dissolution, death or Bankruptcy of a Member, except as otherwise provided in this Agreement.

3.2    Percentage Interests. The Percentage Interest of each Class A Member shall be as set forth on Schedule I, as the same may be amended from time to time in accordance with this Agreement. The Percentage Interest of each Class B Member Profits Interest shall be set forth in an award agreement granted and executed by the Manager.

3.3    Voting; Authority. Except as otherwise stated in this Agreement or required under the Act, Members (other than any Member serving as a Manager) shall not take any part in the day-to-day management or conduct of the business of the Company, nor shall such Members have any right or authority to act for or bind the Company. With respect to all matters requiring a decision of the Members, the Class A Members holding Membership Interests entitled to vote shall have such number of votes that are in proportion to their respective *pro rata* share of all issued and outstanding Membership Interests entitled to vote (*i.e.*, disregarding any Percentage Interest attributable to Class B Interests or other non-voting Membership Interests). Except as otherwise provided in the Act, the Certificate or this Agreement, whenever any action is to be taken by vote of the Members, it shall be authorized upon receiving the affirmative vote of Class A Members holding a Majority Interest.

3.4    Absence of Liability; Indemnification. Except as expressly provided under the Act, the Members shall have no personal liability for the losses, debts, claims, expenses, judgments, penalties or encumbrances of or against the Company or its property. The Company shall indemnify, defend and hold harmless each Member, its Affiliates and their respective stockholders, officers, directors, employees and agents from and against any and all actions, proceedings, claims, demands, losses, damages, costs and expenses (including legal and professional fees and expenses arising therefrom or incidental thereto) that may be made or brought against or directly or indirectly suffered or incurred by such Member, its Affiliates or their respective stockholders, officers, directors, employees and agents by reason of any authorized act or omission performed or omitted in good faith on behalf of the Company by such Member, its Affiliates or their respective stockholders, officers, directors, employees or agents. The foregoing indemnities shall not be made if a judgment or other final adjudication adverse to the Member, its Affiliates or their respective stockholders, officers, directors, employees and agents establishes that such acts or omissions were (i) not authorized by the Company, (ii) performed or omitted in bad faith or (iii) the result of intentional misconduct or a knowing violation of applicable law or this Agreement.

3.5    Meetings of the Members. Except as otherwise stated in this Agreement or required under the Act, the following provisions shall apply to all meetings of the Members.

3.5.1    The Company may hold annual meetings of the Members for the election of the Manager and for any other purpose. Special meetings may be called at any time, and for any purpose, by

63017444

9

AVR00028

the Manager or by Members holding (in the aggregate) at least forty percent (40%) of the Percentage Interests. Annual and special meetings shall be conducted during normal business hours at the principal office of the Company or at such other time and place as shall be determined by the Members.

3.5.2   Notice (as defined in Section 10.2) of time, place and purpose or purposes of each meeting of the Members shall be delivered to each Member in accordance with Section 10.2, at least two (2) business days before the date of the meeting. Notice of a meeting need not be given to a Member if such Member, either before or after the meeting, waives such Notice, or attends such meeting without objecting, at its beginning, to the transaction of any business because the meeting is not lawfully called or convened.

3.5.3   Members entitled to vote at any meeting may vote in person or by proxy at such meeting. Each Member may authorize any Person to act for such member by proxy on all matters in which such member is entitled to vote, including waiving Notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or its attorney-in-fact and shall be revocable at the pleasure of the Member executing it at any time before it is voted.

3.5.4   For the purpose of determining which Members are entitled to receive any distribution or Notice, or to vote at any meeting of Members or any adjournment thereof, the date on which the resolution declaring such distribution is adopted, and the date on which such Notice of meeting or other Notice is mailed, as the case may be, shall be the record date for making such determination.

3.5.5   Except as otherwise provided herein or required by applicable law, Members holding (in the aggregate) more than a Majority Interest, represented in person or by proxy, shall constitute a quorum of Members for purposes of conducting business. Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting. If, however, such quorum shall not be present at any meeting of the Members, the Members entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without Notice other than announcement at the meeting, until Members which own (in the aggregate) more than a Majority Interest shall be present or represented.

3.5.6   A Member may participate in a meeting by conference telephone or similar communications equipment, by means of which all other Persons participating in the meeting can hear each other, and such participation shall constitute presence in person at such meeting.

3.6   Action Without Meeting.   Whenever the vote of the Members at a meeting thereof is required or permitted to be taken for or in connection with any action, whether by any provision of the Act, this Agreement or otherwise, the meeting and vote of the Members may be dispensed with if a written consent, setting forth the action so taken, shall be signed by such Members entitled to vote having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted, and such written consent is filed with the minutes of the meetings of the Members. In the event that such action or approval is effective with less than the unanimous vote or consent of the Members, Notice shall be given by the Manager within ten (10) business days of such consent of such action or approval to any Member whose consent was not obtained.

3.7   Provision of Services; Payment of Expenses.   No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless pursuant to a contract with the Company, or unless otherwise approved by the Manager, no Member shall be entitled to compensation

AVR00029

for services performed for the Company, reimbursement for expenses incurred, or advances of funds made.

3.8     Additional Members.  Additional Persons may be admitted as Members of the Company upon the consent of the Manager.  The Capital Contribution of any additional Member and the Membership Interest to be received in exchange therefore shall be as determined by the Manager.  The Percentage Interests of all other Members shall be adjusted to reflect the Percentage Interest granted to the additional Member (ratably based on the relative Percentage Interests immediately prior to the admission of the additional Member).  In connection with the issuance of additional Membership Interests, the Manager shall specify the number of Units to be allocated to the holder of the additional Membership Interests and shall cause Schedule I to be amended to reflect the issuance of such additional Membership Interests, the admission of any additional Members and the adjustment of the Percentage Interests of all Members.  Any additional Member shall execute an agreement agreeing to be bound by the terms and conditions of this Agreement, with such amendments as the Members may deem necessary or desirable to reflect such event.  When any Person is admitted as a Member or ceases to be a Member, the Manager shall prepare a revised version of Schedule I.

3.9     Loans and Other Business Transactions.  Any Member may, at any time, make a loan to the Company in any amount and on those terms upon which the Manager and such Member agree.  Members may also transact other business with the Company with the approval of the Manager and, in doing so, they shall have the same rights and be subject to the same obligations arising out of any such business transaction as would be enjoyed by and imposed upon any Person, not a Member, engaged in a similar business transaction with the Company.

3.10     Confidentiality.  By virtue of being a Member of the Company, a Member may, from time to time, receive Confidential Information (as hereinafter defined) about the Company or its Affiliates.  For so long as a Member holds Unit(s) and for three (3) years following the date of its final forfeiture, transfer or other disposition of all of its Units, such Member agrees to take all reasonable steps to prevent disclosure of Confidential Information and not use any Confidential Information except as may be necessary for the limited purposes set forth in this Agreement; provided that no provision of this Agreement shall be construed to preclude such disclosure of Confidential Information as may be required by court order.  In the case that Confidential Information shall be required by court order, the affected Member shall give written notice to the Manager prior to making such disclosure.  For purposes of this Agreement, **"Confidential Information"** means all information pertaining to the business, products, services or technology of the Company or its Affiliates that is identified in writing as confidential or is identified orally as confidential at the time of disclosure, or which by its context is understood to be confidential; provided that Confidential Information shall not include any information that (1) is in the public domain at the time of disclosure or enters the public domain following disclosure through no fault of the Member, (2) the Member can demonstrate as already in its possession prior to disclosure hereunder or is subsequently disclosed to the Member with no obligation of confidentiality by a third party having the right to disclose it or (3) is independently developed by the Member without reference to the Company's or its Affiliates' Confidential Information.

ARTICLE IV
MANAGEMENT

4.1     Powers of the Manager.  Except as otherwise provided in this Agreement, the Manager shall have full power and authority, subject in all cases to the requirements of applicable law, to manage the business and affairs of the Company for the purposes herein stated, to make all decisions affecting such business and affairs and to do all things which the Manager deems necessary or desirable in connection with the conduct of the business and affairs of the Company.  Notwithstanding anything to the

AVR00030

contrary contained in this Agreement or the Act, the Manager shall not have authority without first obtaining written approval of the holders of a Majority Interest of the Class A Units to:

4.1.1   sell, convey, or otherwise dispose of all or substantially all of the Company's assets, merge the Company or consolidate with any other Person or effect any transaction or series of related transactions in which more than 50% of the voting power of the Company is disposed of; or

4.1.2   in any manner, alter or change the rights, preferences or privileges of any of the Class A Interests so as to adversely affect such Class A Interests; or

4.1.3   amend, alter or repeal any provision of the Certificate or this Agreement (including any amendment and/or restatement of this entire Agreement) in a manner which has a material adverse effect on the Class A Members; or

4.1.4   authorize or permit any acquisition by the Company in a single transaction or series of related transactions of any business, asset or investment having a value greater than Five Hundred Thousand Dollars ($500,000) (measured by the fair market value at the date of such acquisition); or

4.1.5   incur, or agree to incur, any indebtedness for borrowed money (including capitalized lease obligations) in excess of Five Hundred Thousand Dollars ($500,000) (on either an individual or cumulative basis); or

4.1.6   commence any action or proceeding seeking liquidation, dissolution, reorganization or other relief of or for the Company under any bankruptcy, insolvency or other similar law or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for the Company or any substantial part of the assets of the Company; or fail to contest any such involuntary action commenced by a third party against the Company; or

4.1.7   do any act which would make it impossible to carry on the ordinary business of the Company.

4.2   <u>Resignation of Manager</u>.  The Manager may resign as the Manager of the Company at any time upon reasonable notice to the Company.

4.3   <u>Removal of Manager</u>.  The Members holding a Majority Interest of the Class A Interests may remove the Manager at any time and for any reason upon ninety (90) day notice.

4.4   <u>Election of New Manager</u>.  The Members holding a Majority Interest of the Class A Interests shall elect a new Manager upon the resignation or removal of the Manager.

4.5   <u>Standard of Care</u>.  No Member or Manager of the Company shall be personally liable, responsible or accountable in damages or otherwise to the Company or to any other Person because of any act or failure to act, except to the extent the Person's actions constitute willful misconduct or recklessness.

4.6   <u>Officers; Delegation and Duties</u>.  The Company may have such officers as shall be necessary or desirable to conduct its business.  The Manager may appoint a Member, Manager or other Person to serve as an officer of the Company.  The Manager may assign titles to the officers it appoints. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation of the authority and duties that are

12

AVR00031

normally associated with that office, subject to any specific delegation of authority and duties made by the Manager. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Manager. The initial officers are:

| | |
|---|---|
| Barbara O'Dare | Chief Executive Officer and President |
| Javed Choudry | Chief Financial Officer and Treasurer |
| Donald Geer | Chief Operating Officer and Secretary |

4.7     Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person. For purposes of this Agreement, **"Covered Person"** means a current or former Member or Manager, an affiliate of a current or former Member or Manager, any officer, director, shareholder, partner, member, employee, representative or agent of a current or former Member or Manager or any of their respective affiliates, or any current or former officer, employee or agent of the Company or any of its subsidiaries.

4.8     Exculpation. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence, willful misconduct or willful breach of this Agreement.

4.9     Manager Has No Exclusive Duty to Company.  A Manager shall not be required to manage the Company as his sole and exclusive function and he may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in other investments or activities of a Manager or in the income or proceeds derived therefrom.

4.10     Fiduciary Duty. Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law; *provided*, that (i) the foregoing shall not eliminate the obligation of each Covered Person to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.

4.11     Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence, willful misconduct or willful breach of this Agreement with respect to such acts or omissions; provided, that any indemnity under this Section 4.11 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof. The Company may, in the sole discretion of the Manager, advance to any Covered Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of conduct which is the subject of the indemnification provided hereunder.

AVR00032

4.12    Expenses. To the fullest extent permitted by applicable law, expenses (including, without limitation, reasonable attorneys' fees, disbursements, fines and amounts paid in settlement) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding relating to or arising out of their performance of their duties on behalf of the Company shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified as authorized in this Section 4.12.

ARTICLE V
CAPITAL; CAPITAL ACCOUNTS

5.1    Capital Contributions; Capital Account Balances. The Manager shall be responsible for maintaining accurate Company records, including the names, addresses, Capital Contributions and Percentage Interests of the Members. As of the date hereof, the initial Class A Members have made Capital Contributions in the amounts set forth on Schedule I. The Class A Members' respective Capital Contributions and Percentage Interests in the Company are set forth on Schedule I. Notwithstanding the foregoing, Johnstown Heart & Vascular Center, Inc. shall contribute $36,000 of its Capital Contribution upon execution of this Agreement, and the remaining amount of his Capital Contribution obligation shall be deemed to be contributed as described in Section 6.1.3.

5.2    No Additional Capital Contributions or Capital Contribution Commitments Required. Except for their respective initial Capital Contributions and Capital Contribution Commitments to the Company, no Member shall be required to make any Capital Contributions to the Company or be obligated or required under any circumstances to restore any negative balance in his Capital Account, whether upon the liquidation of the Company or otherwise. To the extent any additional Capital Contributions are not made, as called for by the Manager, in accordance with their respective Percentage Interests, then the Members' Percentage Interests shall be adjusted in such amounts as determined by the Manager.

5.3    No Interest On Capital Contributions. Members shall not be paid interest with respect to Capital Contributions.

5.4    Return of Capital Contributions. Except as otherwise provided in this Agreement, no Member shall have the right to receive the return of any Capital Contribution upon withdrawal from the Company.

5.5    Capital Accounts. A separate Capital Account shall be maintained for each Member.

5.6    Issuance of Profits Interests to Employees and Consultants.

5.6.1    General. The Manager may from time to time cause the Company to issue Class B Interests, which will be Profits Interests, to Employees. When issuing a Profits Interest to an Employee, the Manager shall specify the number of Units (which shall be designated as Class B Units) and the Percentage Interest associated with such Profits Interest and the Percentage Interests of the Members shall be re-computed to reflect the issuance of such Units. This Section 5.6 shall constitute a plan adopted by the Company to govern the issuance of Profits Units to Employees of the Company.

5.6.2    Vesting. The Manager will determine whether each Profits Interest issued by the Company will be a Restricted Interest or an Unrestricted Interest. In the case of a Restricted Interest, the

AVR00033

Manager shall have complete discretion to impose a vesting or forfeiture schedule and other terms and conditions, and to modify such vesting or forfeiture schedule and terms and conditions from time to time. Such terms and conditions shall be set forth in an award agreement granted and executed by the Manager. Unless otherwise provided by the Manager or in the award agreement or required by the Act, if a Member terminates service or employment with the Company before a Restricted Interest has been fully vested or the terms of forfeiture have lapsed, the non-vested portion (or portion subject to risk of forfeiture) of the Restricted Interest shall be automatically forfeited to the Company for no consideration. No Class B Interests shall be entitled to voting rights on any matters on which Members are otherwise entitled to vote.

5.6.3   *Tax Treatment of Profits Interests Issued to Employees.*   The Profits Interests to be issued to Employees under this Section 5.6 shall be issued in consideration of services provided or to be provided to or for the benefit of the Company by such Employees in a Member capacity or in anticipation of being a Member, and such Profits Interests, as of the time of issuance and receipt, are intended to constitute "profits interests" within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343, Revenue Procedure 2001-43, 2001-2 C.B. 191, and any successor guidance thereto and shall not be deemed an interest in the capital of the Company. All terms and provisions of this Agreement shall be interpreted in a manner consistent with this intention. An Employee's initial Capital Account with respect to a Profits Interest issued under this Section 5.6 shall be zero and the Company shall not claim any deduction with respect to the issuance or vesting of such Profits Interest.

5.6.4   *Built-In Gain.*   At the time that a Profits Interest is issued to an Employee under this Section 5.6, the Manager shall determine the extent, if any, by which the aggregate fair market value of the assets of the Company exceeds the aggregate Gross Asset Values (determined before the adjustment made upon the issuance of the Profits Interest as described in paragraph (B) of the definition of Gross Value) (the "**Built-In Gain**"). Notwithstanding anything to the contrary in this Agreement, (i) an Employee who receives a Profits Interest under this Section 5.6 shall not be allocated any portion of the Built-In Gain that is ultimately realized by the Company from the sale or exchange of assets that were owned by the Company (or by a subsidiary company or limited liability company in which the Company has an interest) on the date such Employee received such Profits Interest and (ii) the amount of distributions made by the Company to an Employee with respect to his Profits Interest (exclusive of amounts paid or distributed to such Employee as guaranteed payments or compensation for services) shall be limited to the sum of (A) such Employee's Percentage Interest in Profits arising from the ordinary operations of the Company after the date such Profits Interest was issued and (B) such Employee's Percentage Interest in Profits from a sale of Company assets that is in excess of the amount of Built-In Gain of the Company as of the date such Profits Interest was issued.

5.6.5   *Restricted Interests Treated as Outstanding.*   In accordance with Revenue Procedure 2001-43, if the Company issues a Restricted Interest to an Employee, the Company will treat the Employee as the owner of the Restricted Interest from the date of grant, notwithstanding that all or a portion of the Restricted Interest is subject to a risk of forfeiture, and Profits and Losses will be allocated to the Employee as if the Restricted Interest was fully vested. Notwithstanding the foregoing, the amount of distributions made under ARTICLE VI during any Allocation Year (or portion thereof) with respect to a Restricted Interest which has not yet vested at the time such distributions are made shall be limited to the product of (i) the taxable income allocated or expected to be allocated by the Company for such Allocation Year (or portion thereof) with respect to the Restricted Interest and (ii) the combined net effective rate of federal, state and local income tax (taking into account the deductibility of state income taxes in determining federal income taxes) payable by the Employee on such taxable income, as reasonably determined by the Manager. To the extent the amount distributed to an Employee with respect to a Restricted Interest is reduced as a result of the foregoing limitation, such withheld amount shall be held by the Company on behalf of the Employee and shall be distributed to the Employee as the

03017444

15

AVR00034

Restricted Interest becomes vested, but shall be forfeited to the Company to the extent the Restricted Interest is forfeited prior to vesting.

     5.6.6 *Admission as Member*. Notwithstanding anything in this Agreement to the contrary, an Employee to whom a Profits Interest is issued shall be admitted to the Company as a Member upon execution and delivery by such Employee of a counterpart copy of this Agreement and such other documents as the Manager shall require. The Manager shall maintain and update from time to time a schedule that reflects the issuance and forfeiture of Profits Interests. The Manager shall not be required to deliver copies of such schedule or any version of Schedule I to any Class B Members.

     5.6.7 *Liquidation Value Election*. The Manager shall determine the method, to be consistently applied, for valuing any Class B Interests issued by the Company pursuant to this Section 5.6. Subject to such guidance that the Department of Treasury may issue, the Manager may, taking into account the best interests of the Company, the Members and recipients of Class B Interests, cause the Company and all or any of its Members or recipients of Class B Interests to elect to determine the fair market value of Class B Interests issued under this Section 5.6 as being equal to the Liquidation Value (as defined below) of those Class B Interests (a "**Liquidation Value Election**"). The Liquidation Value Election shall be made in the manner and at such times as prescribed by the Internal Revenue Service. Subject to any guidance issued by the Department of Treasury or the Internal Revenue Service, the effect of the Liquidation Value Election shall be to determine the fair market value of Class B Interests issued under this Section 5.6 by assuming a hypothetical liquidation of the Company occurring immediately prior to the issuance of such Class B Interests and assuming that all assets of the Company are sold for their fair market values (as determined by the Manager) and the net proceeds of such sale are distributed to the Members as provided in this Agreement after the payment of all Company indebtedness and other liabilities ("**Liquidation Value**").

ARTICLE VI
PROFIT, LOSS AND DISTRIBUTIONS

6.1   Distributions.

     6.1.1   Except as provided in Section 6.1.2, Section 6.1.4 and Section 8.2, subject to any restrictions set forth in applicable financing documents of the Company and subject to the provisions of Section 5.6.4 and Section 5.6.5, Cash Flow for each taxable year of the Company shall be distributed to the Members in proportion at such times as determined by the Manager as follows:  (a) first, until the Recovery Date (as defined below), ninety seven percent (97%) to Advanced Vascular Resources, LLC and its permitted successors and assigns and three percent (3%) to Johnstown Heart & Vascular Center, Inc.; and (b) thereafter, to the Members pro rata in proportion to their Percentage Interests.

For purposes hereof, "**Recovery Date**" shall mean the time at which the aggregate distributions in the foregoing subclause (a) equal $1.2 million.

     6.1.2   Notwithstanding the provisions of Section 6.1.1, and subject to Section 8.2, net proceeds from any major capital transaction (including the sale, exchange or other disposition of any significant portion of the assets of the Company) or any financing or refinancing transaction shall be distributed to the Members in the same priority as described in Section 6.1.1.

     6.1.3   For purposes of Section 5.1, the unpaid Capital Contribution obligation of Johnstown Heart & Vascular Center, Inc. shall be reduced by the excess of (x) the amount actually received by Advanced Vascular Resources, LLC and its permitted successors and assigns under subclause (a) of Section 6.1.1 over (y) the amount that would have been distributed to Advanced Vascular

AVR00035

Resources, LLC and its permitted successors and assigns under subclause (a) of Section 6.1.1 had distributions under such subclause (a) been made to the Class A Members in proportion to their ownership of Class A Units.

6.1.4    On or before the date upon which Members are required to make quarterly federal estimated income tax payments and prior to making any other distributions, the Company shall distribute to each Member an amount equal to (i) the estimated amount of the Member's allocable share of the estimated taxable income of the Company for the calendar year to date through the end of the applicable calendar quarter multiplied by aggregate net effective federal and applicable state income tax rate (based upon the highest marginal income tax rates and the state in which the Company has its principal place of business, adjusted to take into account the deductibility of state income taxes for federal income tax purposes, and adjusted as appropriate to take into account lower rates applicable to capital gains and dividends, all as determined by Managers in their reasonable judgment), reduced by (ii) the aggregate distributions previously made by the Company to the Member during the year and any amounts withheld with respect to the Member pursuant to Section 6.3.7 during the year; provided, that no distributions shall be made to a Member under this Section 6.1.4 until the cumulative taxable income allocated to the Member to date exceeds the cumulative tax losses previously allocated to the Member, and in no event shall the distributions by the Company under this Section 6.1.4 exceed Cash Flow available as of the date of the distribution, and provided further that any reduction due to the limit of Cash Flow shall be applied pro-rata among the Members in accordance with the relative shares of the aggregate amount that would otherwise be distributable at that time under this Section 6.1.4. Distributions made under this Section 6.1.4 with respect to estimated tax payments made in January of any year shall be deemed to have been made on December 31 of the prior year. The amount of any distributions to a Member under this Section 6.1.4 shall be treated as an advance against, and shall be applied to reduce, distributions that otherwise would be made to the Member under this Agreement.

6.2    Allocation of Profit or Loss.    After giving effect to the special allocations set forth in Section 6.3, and subject to Section 5.6.4(i), for any Allocation Year of the Company, Profit and Loss shall be allocated to the Members in proportion to their Percentage Interests.

6.3    Regulatory Allocations.

6.3.1    *Impermissible Deficits and Qualified Income Offset.*    No Member shall be allocated Losses or deductions if the allocation causes the Member to have an Adjusted Capital Account Deficit; instead, such items shall be allocated to the other Members in proportion to their respective Percentage Interests. If a Member for any reason (whether or not expected) receives (A) an allocation of Loss or deduction (or item thereof) or (B) any distribution which causes the Member to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Member, before any other allocation is made of Company items for that taxable year (other than an allocation under Section 6.3.2), in the amount and in proportions required to eliminate the excess as quickly as possible; provided, however, that an allocation pursuant to this Section 6.3.1 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement had been tentatively made as if this sentence was not contained in this Agreement. This Section 6.3.1 is intended to comply with, and shall be interpreted consistently with, the "alternate test for economic effect" and "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

6.3.2    *Minimum Gain Chargebacks.*    In order to comply with the "minimum gain chargeback" requirements of Regulations Sections 1.704-2(f)(1) and 1.704-2(i)(4), and notwithstanding any other provision of this Agreement to the contrary, in the event there is a net decrease in a Member's

AVR00036

share of Minimum Gain and/or Member Nonrecourse Debt Minimum Gain during a Company taxable year, such Member shall be allocated items of income and gain for that year (and if necessary, other years) as required by and in accordance with Regulations Sections 1.704-2(f)(1) and 1.704-2(i)(4) before any other allocation is made. It is the intent of the parties hereto that any allocation pursuant to this Section 6.3.2 shall constitute a "minimum gain chargeback" and a "member nonrecourse debt minimum gain chargeback" under Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

6.3.3   *Contributed Property; Book-Ups.*   In accordance with Code Section 704(c) and the Regulations thereunder, including Regulations Section 1.7041(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted under Regulations Section 1.7041(b)(2)(iv)(f), subsequent allocations of income, gain, loss and deduction with respect to the asset shall take into account any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder. The Members agree to use the traditional method with curative allocations, as described in Regulations Section 1.7043(c), for making Code Section 704(c) allocations.

6.3.4   *Code Section 754 Adjustment.*   The Manager may elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property as permitted by Code Section 734(b) and Code Section 743(b).   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his or her Membership Interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their Percentage Interests in the Company in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

6.3.5   *Nonrecourse Deductions.*   Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Members in proportion to their Percentage Interests.

6.3.6   *Member Nonrecourse Deductions.*   Any Member Nonrecourse Deductions for any taxable year or other period shall be specially allocated to the Member who bears the risk of loss with respect to the loan to which the Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.7042(i).

6.3.7   *Withholding.*   All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, local or foreign tax law shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

6.3.8   *Forfeiture Allocations.*   Notwithstanding the other provisions of this ARTICLE VI, upon the forfeiture by any Class B Member of all or any part of any Restricted Interest, the Manager shall determine an amount, whether positive or negative (the "**Forfeiture Amount**"), equal to (i) the excess, if any, of the amount of distributions made with respect to the forfeited Restricted Interest over the amount paid for the forfeited Restricted Interest, (ii) reduced by the cumulative Profit allocated to the Class B Member with respect to the forfeited Restricted Interest, and (iii) increased by the cumulative

AVR00037

Loss allocated to the Class B Member with respect to the forfeited Restricted Interest. In making allocations under Section 6.2 and Section 6.3 for the year in which the forfeiture occurs, (xi) if the Forfeiture Amount is negative, the Manager shall allocate to such Class B Member individual items loss and deduction equal, in the aggregate, to the Forfeiture Amount, and (xii) if the Forfeiture Amount is positive, the Manager shall allocate to such Class B Member individual items of income and gain equal, in the aggregate, to the Forfeiture Amount.

     6.4     Liquidation and Dissolution.

     6.4.1     Upon liquidation of the Company, the assets of the Company shall be distributed to the Members in accordance with the positive balances of their respective Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods. Distributions to the Members pursuant to this Section 6.4.1 shall be made in accordance with Regulations Section 1.704-1(b)(2)(ii)(b)(2).

     6.4.2     No Member shall be obligated to restore a Negative Capital Account.

     6.5     General.

     6.5.1     If any assets of the Company are distributed in kind to the Members, those assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Members so entitled. Unless the Manager otherwise determines, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Manager. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 6.2 and shall be properly credited or charged to the Capital Accounts of the Members prior to the distribution of the assets in liquidation pursuant to Section 6.3.8.

     6.5.2     All Profit and Loss shall be allocated and all distributions shall be made to the Members shown on the records of the Company to have been Members as of the last day of the Allocation Year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's Allocation Year is separated into segments, or if there is a Transfer during the taxable year, the Profit and Loss shall be allocated between the original Member and the successor Transferee on the basis of the number of days each was a holder of a Membership Interest of the Company during the Allocation Year.

     6.5.3     Notwithstanding anything set forth herein, the Manager may, without Member consent or approval, amend this ARTICLE VI to comply with the Code and the Regulations promulgated under Code Section 704(b).

     6.5.4     Solely for purposes of determining a Member's proportionate share of "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), each Member's interest in Company profits shall be based on its respective Percentage Interest.

     6.5.5     The Members are aware of the income tax consequences of this ARTICLE VI and agree to be bound by these provisions in reporting their shares of Profit, Losses, and other items for federal and state income tax purposes.

     6.6     Limitations on Distributions. Notwithstanding any provision to the contrary contained in this Agreement, the Company, and the Manager on behalf of the Company, shall not be required to make

AVR00038

a distribution to any Member on account of its interest in the Company if such distribution would violate Section 14-11-407 of the Act or other applicable law.

## ARTICLE VII
## TRANSFERABILITY OF MEMBER INTERESTS

7.1     Restrictions on Transfer of Membership Interests.   No Member will, during such Member's lifetime, Transfer any Membership Interest held by such Member, except with the written consent of the Manager or otherwise as expressly provided for in this ARTICLE VII; provided, however, that Advanced Vascular Resources, LLC may transfer its Units to its members and affiliates without the prior consent of the other Members and the Manager.   The term "Transfer" does not include any sale, transfer or other disposition by the Company of any of its assets or any merger or consolidation of the Company with any other entity, whether or not as a result of such transaction any Membership Interest shall be converted into or become exchangeable for other securities of the Company or any other Person.

7.2     Option in Favor of the Company to Purchase Membership Interests in the Event of Certain Encumbrances; Transfers in Violation of this Agreement or Involuntary Transfers of Membership Interests.

7.2.1     Upon the occurrence of any of the following events affecting or relating to a Member, the applicable Member shall give prompt Notice to the Company of the event, and upon receipt of such Notice, the Company shall have the option to purchase all or a portion of the Membership Interest held by such Member at such time:

(i)     a Member shall propose to pledge or otherwise encumber any Membership Interest held by such Member;

(ii)     a Member shall purport to Transfer any Membership Interest held by such Member in violation of this Agreement;

(iii)     the Membership Interest held by a Member shall be attached, levied upon or executed against in connection with the enforcement of any lien or encumbrance or otherwise be transferred by operation of law (other than the laws of descent, distribution or inheritance); or

(iv)     the Bankruptcy of a Member.

7.2.2     Such option may be exercised by the Company at any time within sixty (60) days after the date the Company shall have received written notice that such an event shall have occurred at the price set forth in Section 7.9.   The manner in which any such purchase shall be completed is set forth in Section 7.10.

7.2.3     If the Company shall not have determined to exercise such option in full within the period mentioned in Section 7.2.2, the Company shall give Notice to each Class A Member (the Class A Members excluding the affected Member if such affected Member is a Class A Member, the "**Other Members**").   The Other Members may purchase such of the Membership Interest as to which the Company shall not have exercised its option by giving Notice to the affected Member within thirty (30) days of their receipt of the Company's Notice.   If more than one Other Member elects to purchase any of such Membership Interest, then the Other Members electing to purchase such Membership Interest shall have the right to purchase such Membership Interest in proportion to their respective Percentage Interests, or in such other proportions as they may mutually agree.

AVR00039

7.2.4    If neither the Company nor the Other Members elect to exercise such options, or if the Company and/or the Other Members do not purchase the affected Member's entire Membership Interest, the affected Member or the successor to the affected Member, as the case may be, effective as of the occurrence of any of the events set forth in Section 7.2.1, shall be and remain a mere interest holder in the Company, shall not be entitled to any of the rights granted to a Member hereunder or under the Act, other than the right to receive all or part of the share of Profits, Losses and distributions to which the assignor or predecessor would otherwise have been entitled; and unless and until the assignee or successor is admitted as a Member, the assignee or successor shall not have any right to vote on matters coming before the Members; participate in management of the Company; act as an agent of the Company; attend meetings of the Members; have access to any other information of the Company, except to the extent necessary to prepare the Person's state and federal income tax returns; or to demand an accounting with respect to the Company.

7.3    Forfeiture Upon a Termination for Cause; Options to Purchase Upon Other Terminations of Employment.

7.3.1    Upon the termination of employment of a Class B Member who is an Employee of the Company, by the Company for Cause, all of the Membership Interest (including any Restricted or Unrestricted Profits Interest) directly or indirectly held by such Class B Member on the date of termination shall automatically be forfeited and cancelled without any payment due to the Class B Member or any further action required on the part of the Company.

7.3.2    Upon the termination of employment of a Class B Member who is an Employee of the Company, by such Employee's own volition, the Company shall have the option to purchase all or a portion of the Membership Interest directly or indirectly held by such Class B Member that is an Unrestricted Interest or is otherwise vested on the date of termination.

7.3.3    Upon the termination of employment of a Class B Member who is an Employee of the Company, by the Company without Cause, the Company shall have the option to purchase all or a portion of the Membership Interest directly or indirectly held by such Class B Member that is an Unrestricted Interest or is otherwise vested on the date of termination.

7.3.4    Any portion of a Membership Interest that is not vested on a date of termination, for any reason, shall automatically be forfeited and cancelled without any payment due to the Class B Member or any further action required on the part of the Company unless otherwise expressly provided in the award agreement or determined by the Manager.

7.3.5    The options referred to in Section 7.3.2 and Section 7.3.3 may be exercised by the Company by giving Notice thereof to such Member within thirty (30) days after the date of termination of such employment.

7.3.6    If the Company shall not have determined to exercise such option in full within the period mentioned in Section 7.3.5, the Company shall give Notice to each Other Member. The Other Members may purchase such of the Membership Interest as to which the Company shall not have exercised its option by giving Notice to the affected Member (or such Member's personal representative or heirs) within thirty (30) days after the expiration of the period mentioned in Section 7.3.5. If more than one Other Member elects to purchase any such Membership Interest, then the Other Members electing to purchase such Membership Interest shall have the right to purchase such Membership Interest in proportion to their respective Percentage Interests, or in such other proportions as they may mutually agree.

AVR00040

7.3.7    The price at which such optional purchase shall be completed shall be as set forth in Section 7.9. The manner in which any such purchase shall be completed is set forth in Section 7.10.

7.4    The Company's Option to Purchase Membership Interests upon the Death or Permanent Disability of a Member.

7.4.1    Upon the death or Permanent Disability of a Member who is a natural Person, the Company shall, at any time within thirty (30) days after the date of death or Permanent Disability of such Member, have the option to purchase, and such Member (or such Member's personal representative or heirs) shall sell all or a portion of the Membership Interest held by such Member at such date.

7.4.2    If the Company shall not have determined to exercise such option in full within the period mentioned in Section 7.4.1, the affected Member shall give Notice to the Other Members. The Other Members may purchase such of the Membership Interest as to which the Company shall not have exercised its option by giving Notice to the affected Member (or such Member's personal representative or heirs) within thirty (30) days after the expiration of the period mentioned in Section 7.4.1. If more than one Other Member elects to purchase any of such Membership Interest, then the Other Members electing to purchase such Membership Interest shall have the right to purchase such Membership Interest in proportion to their respective Percentage Interests, or in such other proportions as they may mutually agree.

7.4.3    For purposes of this Agreement, a natural Person will be deemed to have a **"Permanent Disability"** if he or she is entitled to long-term disability benefits under a long-term disability policy maintained by the Company and covering the Employee or, in the absence of such a policy, if he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months. An individual who is not entitled to long-term disability benefits pursuant to a policy maintained the Company shall not be considered to be subject to a Permanent Disability unless he or she furnishes proof of the existence thereof in such form and manner, and at such times, as the Manager may require.

7.4.4    The price at which the option to purchase set forth in this Section 7.4 shall be completed shall be as set forth in Section 7.9, and the manner in which such purchase shall be completed is set forth in Section 7.10.

7.5    Drag Along Right.  Notwithstanding any other provision of this Agreement to the contrary, the holders of a Majority Interest of the Class A Interests shall have the right, exercisable by notice (the **"Notice of Sale"**) to all other Members (**"Minority Members"**), to require the Minority Members to sell all (but not less than all, unless the selling Majority Interest are selling less than all of their Membership Interest, in which case the Minority Members will be obligated to sell only the same proportion of their Membership Interest as such Majority Interest are selling) of the Membership Interest owned by the Minority Members to the purchaser (who shall be bona fide and named in the Notice of Sale, together with the terms and conditions of sale, which shall be arm's length), such sale to take place contemporaneously with, and on the same terms and conditions of, the sale of the Membership Interest by the holders of the Majority Interest.  If the holders of the Majority Interest approve a sale of all or substantially all of the assets of the Company to, or a merger or consolidation of the Company with or into, a third party in a bona fide, arm's length sale, then the holders of the Majority Interest may require the Minority Members to vote all of the Membership Interest of the Minority Members (to the extent any of such Membership Interest has voting rights) in favor of the sale, merger or consolidation.

22

AVR00041

7.6     <u>Rights of Transferees Pending the Exercise or Expiration of Options.</u> If any Membership Interest shall be transferred in a transaction or by reason of an event which gives rise to an option exercisable by the Company to purchase such Membership Interest, the transferee thereof shall not be entitled to vote such Membership Interest or otherwise to exercise any of the rights of a registered holder thereof until the time shall have expired (i) for the exercise of such option or (ii) if such option shall be exercised, for the completion of settlement of such purchase.

7.7     <u>The Company May Assign Its Rights to Purchase Membership Interests.</u> The Company may, upon due authorization by its Manager, assign to one or more Persons (each of whom then is, or upon acquisition of any Membership Interest shall become, a party to this Agreement) all or any part of the Company's right to purchase any Membership Interest pursuant to any option to purchase Membership Interests provided for in this Agreement.

7.8     <u>Settlement for Purchase of Membership Interest.</u> Settlement for any purchase of Membership Interests pursuant to this <u>ARTICLE VII</u> shall take place at the principal office of the Company, within the following times:

7.8.1     In the case of a purchase by exercise of an option provided for in <u>Section 7.2</u> or <u>Section 7.3</u>, such settlement shall be completed within thirty (30) days after such option shall have been duly exercised; and

7.8.2     In the case of a purchase pursuant to <u>Section 7.4</u> such settlement shall be completed within ninety (90) days after the death or Permanent Disability of such Member.

7.9     <u>Purchase Price.</u> Except as otherwise provided in this Agreement, the purchase price for a Member's Membership Interest is:

7.9.1     In the case of a purchase by exercise of an option provided for in <u>Section 7.2</u> or <u>Section 7.3.2</u>, the purchase price shall be the product of the Percentage Interest of the Member multiplied by three (3) times Net Profits;

7.9.2     In the case of a purchase by exercise of an option provided for in <u>Section 7.3.3</u>, the purchase price shall be the product of the Percentage Interest of the Member multiplied by four (4) times Net Profits; and

7.9.3     In the case of a purchase by exercise of an option provided for in <u>Section 7.4</u>, the purchase price shall be the product of the Percentage Interest of the Member (or his personal representative or heirs) multiplied by four (4) times Net Profits.

Notwithstanding the foregoing provisions of this <u>Section 7.9</u>, in the case of the purchase of any Class B Interest, the purchase price shall be reduced by the product of the Percentage Interest attributable to the Class B Interest and the Built In Gain determined upon issuance of the Class B Interests.

7.10     <u>Payment of the Purchase Price.</u>

7.10.1     At the settlement for the purchase of a Membership Interest pursuant to this <u>ARTICLE VII</u>, the purchase price may be paid, at the option of the purchaser, over a period of three (3) years, in twelve (12) equal consecutive quarterly installments commencing on the date of such settlement ("**Settlement Date**"), with interest from the Settlement Date on the unpaid balance at the Prime Rate. The obligation of such purchaser to pay such balance of the purchase price shall be evidenced by such purchaser's promissory note, payable to the order of the Member whose Membership Interest is so

23

AVR00042

purchased (or to the estate of such Member, if deceased), on the foregoing terms in the form attached hereto as Exhibit A.

7.10.2 Notwithstanding anything herein to the contrary, if the Company is the beneficiary of any insurance on the life of a deceased Member, then the Company, in the reduction of the purchase price, shall pay to the deceased Member's estate, in cash or immediately available funds at the time of receipt of the proceeds, the proceeds of that insurance which the Company receives to the extent of the purchase price. Any balance due shall be paid pursuant to the provisions of Section 7.10.1.

7.11    Determination of Purchase Price. Any determination of the purchase price pursuant to this Agreement shall be made by the Company's regularly engaged, independent accountants. Such determination shall be final, binding and conclusive upon all parties.

7.12    Company and Member Action in Aid of Purchase. The Company will, and each Member will cause the Company to, take all such legal action under the Act as may be necessary to enable the Company to purchase legally any Membership Interest for which it is required or has agreed to be purchased by it hereunder.

7.13    Failure to Offer or Transfer Membership Interest. If any Person whose Membership Interest is subject to purchase hereunder does not assign and Transfer such Membership Interest to the purchaser at the Settlement therefor as provided for herein upon tender of the purchase price payable at the Settlement therefor (including the promissory note called for by Section 7.10.1), such tender will result in an immediate assignment and Transfer of such Membership Interest to such purchaser. Each Member hereby appoints irrevocably any officer of the Company as the attorney-in-fact of such Member to make assignments and transfers on the Company's books on behalf of such Member in accordance with the foregoing.

7.14    Transfer of Interests in General.

7.14.1 *Conditions to Transfer.* In addition to the other requirements of this Agreement, no Member shall be entitled to Transfer all or any part of such Member's Membership Interest unless all of the following conditions have been met: (a) the Company shall (at its option) have received an attorney's written opinion, in form and substance reasonably satisfactory to the Company, specifying the nature and circumstances of the proposed Transfer, and based on such facts stating that the proposed Transfer will not be in violation of any of the registration provisions of the Securities Act of 1933, as amended, or any applicable state securities laws; (b) the Company shall have received from the transferee (and the transferee's spouse if such spouse will receive a community property interest in the Membership Interest) a written consent to be bound by all of the terms and conditions of this Agreement; (c) the Transfer will not result in the loss of any license or regulatory approval or exemption that has been obtained by the Company, or result in a default under or breach or termination of any contract to which the Company is a party, and in each case that is materially useful in the conduct of its business as then being conducted or proposed to be conducted; and (d) the Company is reimbursed upon request for its reasonable expenses in connection with the Transfer.

7.14.2 *Invalid Transfers.* Transfers in violation of this Section 7.14 or in violation of any other provision of this Agreement shall be null and void *ab initio* and of no effect whatsoever.

7.15    Restrictions Continue After Transfer. After the effective date of any Transfer of all or a portion of a Member's Membership Interest in accordance with this Agreement, the Membership Interest so transferred shall continue to be subject to the terms, provisions and conditions of this Agreement and any further Transfers shall be required to comply with all of the terms, provisions and conditions of this

AVR00043

Agreement. Any transferee of a Membership Interest shall take such Membership Interest subject to the restrictions on Transfer imposed by this Agreement.

## ARTICLE VIII
## DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE COMPANY

8.1    <u>Right to Cause Dissolution; Events of Dissolution</u>.

8.1.1    No Member shall have the right to, and each Member shall not, cause the winding up of, or dissolution, termination or liquidation of the Company, or to petition a court for the winding up, dissolution, termination or liquidation of the Company. The Company shall not be dissolved by the admission of additional Members or substitute Members in accordance with the terms of this Agreement.

8.1.2    The Company shall be dissolved automatically and its affairs wound up, without further act, upon the happening of the first to occur of the following: (A) the written consent of the Class A Members holding a Majority Interest, or (B) the entry of a decree of judicial dissolution under Section 14-11-603 of the Act, unless a majority of the remaining Class A Members vote to continue the Company.

8.2    <u>Procedure for Winding Up and Dissolution</u>. If the Company is dissolved, the Manager shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first to creditors of the Company, including Members who are creditors, in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof and including the satisfaction of all contingent, conditional and unmatured liabilities of the Company), and then to the Members in amounts equal to the Positive Capital Accounts of each Member after taking into account all Capital Account adjustments during the Allocation Year during with the liquidation occurs, including adjustments under <u>Section 6.3.8</u>.

8.3    <u>Filing of Certificate of Dissolution</u>. Upon completion of the winding up of the affairs of the Company, the Manager, or other Person(s) winding up the affairs of the Company, shall cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State certificate of dissolution as provided in the Act.

## ARTICLE IX
## BOOKS, RECORDS, ACCOUNTING AND TAX ELECTIONS

9.1    <u>Bank Accounts</u>. All funds of the Company shall be deposited in a bank account, or accounts, opened in the Company's name. The bank accounts will be maintained in locations as shall be determined by the Manager from time to time, subject to any requirements imposed by applicable financing documents. The Manager shall determine the financial institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

9.2    <u>Maintenance of Books and Records</u>. The Manager shall keep or cause to be kept, at the Company's principle office, or at such other place as it shall designate in a Notice to the Members, complete and accurate books, records, and financial statements of the Company and supporting documentation of transactions with respect to the conduct of the Company's business. The books, records and financial statements of the Company shall be maintained on the cash basis in accordance with GAAP.

AVR00044

9.3     Financial Statements and Reports. The Manager shall provide the following financial statements and reports to the Members:

9.3.1   *Annual Financial Statements.* As soon as practicable after the end of the Company's fiscal year, the Manager shall provide to the Members unaudited financial statements, including a balance sheet of the Company as of the end of the preceding fiscal year and related statements of income, cash flow and Members' capital and changes in financial position for such fiscal year.

9.3.2   *K-1s.* As soon as practicable after the end of each fiscal year, the Manager shall furnish to each Member a Form K-1 or any similar form as may be required by the Code or the Internal Revenue Service, as well as any similar form which may be required by any state or local taxing authority.

9.3.3   *Tax Returns and Information.* The Manager shall cause to be prepared tax returns and statements, if any, which must be filed on behalf of the Company with any taxing authority. In addition, the Company shall send or shall cause to be sent to each Member by March 31st of each calendar year, or earlier if required to do so by the Act or any other applicable law: (A) such information as is necessary to complete federal, state and local income tax or information returns, and (B) a copy of the Company's federal, state and local income tax or information returns for the fiscal year.

9.4     Annual Accounting Period (Fiscal Year). The annual accounting period or fiscal year of the Company shall be its taxable year. The Company's taxable year shall be the calendar year.

9.5     Tax Matters. When necessary, the Manager shall designate a Member to be the "Tax Matters Partner" for the purposes of Code Section 6231. In addition, the Manager shall direct, approve, have prepared and filed all tax returns for the Company with all applicable authorities. The Company shall elect to be treated as a partnership for all tax purposes.

ARTICLE X
GENERAL PROVISIONS

10.1    Assurances. Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules and regulations relating to the acquisition, operation, or holding of the property of the Company.

10.2    Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "**Notice**") required or permitted under this Agreement must be in writing and shall be deemed to have been duly given and received (A) on the date of service, if a business day, when served personally or sent by facsimile transmission to the party to whom notice is to be given, otherwise on the next business day, or (B) on the fourth day after mailing, if mailed by first class registered or certified mail when mailed nationally, or by registered airmail when mailed internationally, postage prepaid, and addressed to the party to whom notice is to be given at the address set forth on Schedule I, or at the most recent address specified by written notice given to the other Members hereto, or (C) on the next business day if sent by a nationally or internationally recognized courier for next day service and so addressed and if there is evidence of acceptance by receipt.

10.3    Specific Performance. The Members recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any member who may be injured (in addition to any other remedies which may be

I

AVR00045

available to that Member) shall be entitled to one or more preliminary or permanent orders (A) restraining and enjoining any act which would constitute a breach or (B) compelling the performance of any obligation which, if not performed, would constitute a breach.

10.4   Partition.   Each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

10.5   Complete Agreement.   This Agreement constitutes the complete and exclusive statement of the agreement among the Members.  It supersedes all prior written and oral agreements and statements, and any prior representation, statement, condition or warranty.  Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

10.6   Applicable Law.   All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware, with the exception of questions concerning the construction, validity or interpretation of the restriction against Member holding an ownership interest in a competing vascular center while also holding an ownership interest in the Company, as set forth in Section 2.3, which shall be governed by the internal laws of the State of Florida, without regard for conflicts of law principles or provisions.

10.7   Section Titles.   The headings herein are inserted as a matter of convenience only and do not define, limit or describe the scope of this Agreement or the intent of the provisions hereof.

10.8   Binding Provisions.   This Agreement is binding upon, and to the limited extent specifically provided herein, inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors and assigns. Notwithstanding anything to the contrary contained in this Agreement, none of the provisions of this Agreement shall be construed as for the benefit of or as enforceable by any creditor of the Company or of any Member or any other Person not a party to this Agreement.

10.9   Interpretation.   Unless the context of this Agreement clearly requires otherwise, (A) references to the plural include the singular and vice versa, (B) references to any gender or "it" includes all genders and/or entities, as applicable, (C) "or" has the inclusive meaning frequently identified with the phrase "and/or," (D) "including" has the inclusive meaning frequently identified with the phrase "without limitation," (E) references to "hereunder", "hereof" and "herein" relate to this Agreement, and (F) all calculations and payments made under this Agreement shall be calculated and paid in United States dollars.

10.10   Separability of Provisions.   Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, and the invalid provision or provisions shall be revised to the extent necessary to make it or them valid without changing the intent of the parties with regard to such provision or provisions.

10.11   Counterparts.   This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

63017444                                    27

AVR00046

10.12 <u>Waiver</u>. No failure on the part of any Member to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. In order for any waiver to be effective it shall be in writing and signed by the waiving Member.

10.13 <u>No Dissenters' Rights</u>. Notwithstanding any contrary provisions of the Act, the Members will have no right to dissent.

10.14 <u>No Partnership Intended for Non-Tax Purposes</u>. The Members have formed the Company under the Act, and expressly disavow any intention to form a partnership under the partnership act or laws of any state. The Members do not intend to be partners one to another or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

**[Remainder of Page Intentionally Left Blank]**

AVR00047

IN WITNESS WHEREOF, the Company and the Members have executed this Agreement as of the date first set forth above.

ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC

By: AVR MANAGEMENT, LLC, its Manager

By: _Barbara O'Dare_
Name: Barbara O'Dare
Title: Authorized Officer

**CLASS A MEMBERS:**

ADVANCED VASCULAR RESOURCES, LLC

By: _Barbara O'Dare_
Name: Barbara O'Dare
Title: Authorized Officer

Agreement of Manager effective as of the 7th day of November 2013. The undersigned Manager hereby agrees to be the Manager of the Company pursuant to the Operating Agreement and hereby agrees to abide by the provisions of the Operating Agreement and the Act, to the extent applicable, as they relate to the activities of the Manager and the operation of the Company.

By: AVR MANAGEMENT, LLC

By: _Barbara O'Dare_
Name: Barbara O'Dare
Title: Authorized Officer

[Counterpart signature pages of additional Class A Members and Class B Members follow]

AVR00048

**COUNTERPART SIGNATURE PAGE OF CLASS A MEMBERS TO**
**OPERATING AGREEMENT OF**
**ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC**
**DATED AS OF _____, 2013**

In accordance with Section 3.8 of that certain Operating Agreement of ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC, dated as of November 7, 2013 (the "**Agreement**"), the undersigned, by its signature hereto, agrees to become a Class A Member of the Company and be bound by all of the terms and conditions in the Agreement, effective as of the date set forth below, and shall make the following Capital Contribution: $480,000.00 . Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Agreement.

INDIVIDUAL SIGNATURE:

_____

Print Name:

_____

Print Name of Co-owner, if any:

ENTITY SIGNATURE:

Print Entity Name:                          _____
                                            JOHNSTOWN HEART AND VASCULAR CENTER, INC.
                                            By: _____
                                            Name: Samir Hadeed, M.D.
                                            Title: President

AVR00049

**COUNTERPART SIGNATURE PAGE OF CLASS A MEMBERS TO**
**OPERATING AGREEMENT OF**
**ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC**
**DATED AS OF _____, 2013**

      In accordance with Section 3.8 of that certain Operating Agreement of ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC, dated as of November 7 , 2013 (the "**Agreement**"), the undersigned, by its signature hereto, agrees to become a Class A Member of the Company and be bound by all of the terms and conditions in the Agreement, effective as of the date set forth below, and shall make the following Capital Contribution: _____ . Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Agreement.

INDIVIDUAL SIGNATURE:

_____

Print Name:

_____

Print Name of Co-owner, if any:

ENTITY SIGNATURE:

Print Entity Name:      _____

By: _____
Name:
Title:

AVR00050

**COUNTERPART SIGNATURE PAGE OF CLASS B MEMBERS TO**
**OPERATING AGREEMENT OF**
**ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC**
**DATED AS OF _____, 2013**

      In accordance with <u>Section 5.6.6</u> of that certain Operating Agreement of ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC, dated as of <u>November 7</u>, 2013 (the "**Agreement**"), the undersigned, by his or her signature hereto, agrees to become a Class B Member of the Company and be bound by all of the terms and conditions in the Agreement, effective as of the date set forth below.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Agreement.

EMPLOYEE SIGNATURE:

_____

Print Name:

AVR00051

**SCHEDULE I**

**MEMBER NAME AND ADDRESS, CAPITAL CONTRIBUTION, NUMBER OF UNITS, AND
PERCENTAGE INTERESTS FOR MEMBERSHIP INTERESTS**

| Name of Member | Capital Contribution | Number of Units Purchased/ Awarded | Current Class A Percentage Interest | Current Class B Percentage Interest | Fully Diluted Percentage Interest |
|---|---|---|---|---|---|
| **CLASS A MEMBERS:** | | | | | |
| Advanced Vascular Resources, LLC 575 Rt. 73 North Suite A-6 West Berlin, NJ 08091 | $ 540,000 | 45,000 | 45.00% | - | 45.000% |
| Johnstown Heart & Vascular Center, Inc. | $ 660,000 | 55,000 | 55.00% | - | 55.000% |
| **SUBTOTAL CLASS A:** | **$ 1,200,000** | **100,000** | **100.00%** | | **100.000%** |
| **CLASS B MEMBERS:** | | | | | |
| (See attached schedule of Class B Members) | | | | | |
| **SUBTOTAL CLASS B:** | | | | | |
| **TOTAL:** | **$ 1,200,000** | **100,000** | **100.00%** | | **100.000%** |

A-1

AVR00052

<u>SCHEDULE I</u>
(Continued)

**CLASS B MEMBER NAME AND ADDRESS, NUMBER OF UNITS, AND PERCENTAGE
INTERESTS FOR MEMBERSHIP INTERESTS**

| Name and Address of Class B Member | Number of Units Purchased/ Awarded | Current Class B Percentage Interest | Fully Diluted Percentage Interest |
|---|---|---|---|
| | | | |
| | | | |
| TOTAL: | | | |

AVR00053

**EXHIBIT A**

**Promissory Note**

$_____                                    _____, _____

FOR VALUE RECEIVED, the undersigned ("**Maker**") promises to pay to the order of _____ ("**Holder**"), at _____ or at such other place as Holder may from time to time designate, the principal sum of _____ Dollars ($_____) (the "**Loan**"), together with interest on the unpaid principal balance outstanding from time to time, all as hereinafter set forth. Payments of both principal and interest shall be paid in lawful money of the United States of America, which shall be legal tender in payment of all debts and dues.

The following terms shall apply to this Promissory Note:

1.      Interest.  Interest on the outstanding principal balance of the Loan shall accrue at the Prime Rate, as adjusted monthly.  Interest shall be computed on the actual number of days outstanding based on a three hundred sixty (360) day year and accrued interest shall be payable on the Maturity Date, as hereinafter defined.

2.      Loan Term.  If not sooner paid, the entire outstanding principal balance of the Loan, all accrued and unpaid interest and any other payment due hereunder shall be due and payable in twelve (12) consecutive equal quarterly installments of principal in the amount of $_____ each plus accrued interest thereon, beginning on _____, ____, and continuing on the same date in each and every month thereafter until _____ (the "**Maturity Date**") when the entire unpaid balance plus all accrued and unpaid interest shall be due and payable in full.  All parties to this note, whether maker, endorser, or guarantor, agree that the maturity of this Promissory Note, or any payment due hereunder, may be extended at any time or from time to time without releasing, discharging, or affecting the liability of such party.

3.      Payment of Principal and Interest.  All payments hereunder, in Holder's sole discretion, may be applied first to the payment of accrued and unpaid interest and the balance to the payment of principal.

4.      Prepayment.  This Promissory Note may be prepaid in whole or in part at any time without premium or penalty; provided, however, that each such prepayment shall be accompanied by payment of all unpaid late payment penalties, if any, which are due plus all accrued and unpaid interest due as of the date of such prepayment.  All partial prepayments of principal shall be applied to any principal installment payments in the inverse order of their maturity.

5.      Events of Default; Acceleration.  If any payment due hereunder is not paid within ten (10) days after written notice that the amount was due, Holder, in Holder's sole discretion and without notice or demand, may declare the entire unpaid principal balance plus accrued interest and all other sums due hereunder immediately due and payable.  Failure by Holder to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

6.      Costs and Expenses; Waiver by Maker.  Maker shall pay to Holder and reimburse Holder for any and all costs and expenses, including attorney's fees and court costs, if any, incurred by Holder if suit is filed to enforce or collect this Promissory Note.  Maker waives presentment, protest and demand, notice of protest, notice of dishonor and nonpayment of this Promissory Note and expressly agrees that

6301744.4                                    A-1                                    Exhibit A
                                                                        AVR of Johnstown – Operating Agreement

AVR00054

this Promissory Note or any payment hereunder may be extended from time to time without in any way affecting the liability of any Maker hereunder.

      7.   <u>Cumulative Remedies; No Waiver by Holder</u>.  The rights and remedies of Holder hereunder shall be cumulative and concurrent and may be pursued singularly, successively or together at the sole discretion of Holder, and may be exercised as often as occasion therefor shall occur, and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same or any other right or remedy.

      8.   <u>Evidence of Indebtedness</u>.  This Promissory Note is given and accepted as evidence of indebtedness only, and not in payment or satisfaction of any indebtedness or obligation.

      9.   <u>Headings</u>.  The headings used in this Promissory Note are for convenience only and are not to be interpreted as a part of this Promissory Note.

      10.   <u>Definitions</u>.  Capitalized terms used in this Promissory Note that are not otherwise defined herein shall have the meanings given to them in the Operating Agreement of ADVANCED VASCULAR RESOURCES OF JOHNSTOWN, LLC, dated as of _____, 2013, by and among the signatories listed therein.

      11.   <u>Governing Law; Jurisdiction; Forum</u>.  This Promissory Note, its validity, enforcement and interpretation, shall be governed by the laws of the State of Delaware (without regard to conflict of law principles).  Maker hereby irrevocably submits to the jurisdiction of the state courts of the State of Delaware and the federal courts sitting in the State of Delaware in any action, suit or proceeding arising out of or relating to the transactions contemplated hereby. Maker waives any objection based upon venue or inconvenience of forum.  Nothing in this Promissory Note limits the right of Holder to bring proceedings against Maker in the courts of any other jurisdiction or jurisdictions.

      IN WITNESS WHEREOF, Maker has executed this Promissory Note specifically intending this Promissory Note to constitute an instrument under seal.

                                 _____(SEAL)

AVR00055